Good morning. May it please the court. I'm Kirby Heller. I represent the United States. I'd like to reserve three minutes in rebuttal. The Fourth Amendment does not require the police to simply walk away when in response to a 9-1-1 call reporting the potentially deadly combination of multiple shots and a woman screaming for help because they have to confirm the emergency from the outside of the residence. The call didn't indicate that anything was happening inside a residence, did it? I'm sorry, Your Honor? Did the call indicate that there was anything happening inside a residence? The call didn't differentiate between inside or outside the residence. The caller simply reported what he had heard. He said it sounds like it's coming from the corner of this The troopers responded in their community caretaking function. They were not there for a law enforcement purpose. They were there because they reasonably thought there was an emergency. They thought there was a domestic dispute perhaps that was involved. And in those circumstances, this Court has noted that conscientious police officers engaging in that role should err on the side of caution. And that's what these troopers did. In concluding that the troopers did not have a reasonable basis to believe that there was still an emergency when they got there, the Court made the exact same errors that the Supreme Court identified in Ryburn, and it made a few others as well. First, the Court failed to consider the assessment, its second guess, the officers' assessment that they made on the scene in response, again, to this emergency, rapidly evolving facts, perhaps... Wait a minute. Let's go back to the facts for a minute, as I understand. Sure. Okay, so these officers are sent to this particular location, or they said they're going to respond to this location. That's correct, Your Honor. Why did they select this particular trailer? Well, the trailer was described in detail, enough detail. The 911 caller called in and said, gunshots from this trailer? What the... Or gunshots from this area? I don't believe he said, it sounds like it's coming from this corner, mobile home there, lots of cars in the driveway. Dispatch, in referring to that, and there was an exhibit at the hearing, so they're not... What's told to the troopers, because they don't hear the 911 call, what's told to them is, on Gaswell, you know, he describes what he hears, woman yelling, help, stop, help, help, sounded like it's coming from the corner of Rustick and Gaswell, mobile home there with lots of cars. Now, one of the officers was familiar with that area, correct? They all knew exactly what was being described. They all knew, in fact, or at least two of them knew, that Mr. Scherff lived there. They also, especially Sergeant Fowler, was familiar with Mr. Scherff. So they go out to the trailer. That's correct. And they get there. There's nothing really happening in the yard area, right? There's nothing happening in the yard area, but they don't know. Again, this... Did they hear any sounds going on, any yelling or screaming? Well, they each described something different. Trooper Sundergard says it sounded like a party. Sergeant Fowler said he went by a window and he could hear loud, or he could hear raised male voices, and Trooper Vick said the music was so loud, I wouldn't have been able to hear any voices. It was Halloween, right? It was Halloween. And although there was noise coming from the trailer, these were not voices. There's no evidence these were voices raised in anger. There was a party going on. Well, they don't know. What they do know is that there had been a woman. What had been reported was a woman screaming for help. And the question is, when they didn't hear someone screaming for help or didn't see blood or something else, should they have walked away? And I think a reasonable... Well, they knocked on the door. They knocked on the door. I forget which officer knocked on the door. Sundergard and Vick. Sundergard knocked on the front door. Ms. Fowler? Ms. Miller. Miller. Miller. Answers. Right? That's correct. And what was the exchange? As far as we know from the recording. Right, so we do know what was exchanged. He identifies himself, and he basically says, we had reports of a scream, and Ms. Miller says, that was me. Again, confirming they're in the right location. And then he says, we have to come in, and she's like, no. Do you have a warrant? I thought there was something about domestic. Yes, he mentions that. We have to come in before he mentions that. She says there's no domestic. She says there's no domestic. We heard shots. I don't know about that. You can't come in. She shouts to Sheriff, the troopers are here. And so, according to Sundergard, and we can submit the, because there is an actual recording, we can submit it as well. She was unusually aggressive for that situation. She wouldn't let him ask his questions. She's trying to investigate. Did the district court make a finding that she was, how would you say, unusually aggressive? No. In fact, what the magistrate judge said was that she was as polite as the situation called for without even listening to it. If you look at the transcript that's attached to the magistrate judge's report with her including profanities, I'm not sure that that's exactly an accurate description. Well, officers come to the door and seek entrance, and she says repeatedly, you're not coming in here without a warrant because they're repeatedly trying to get in without a warrant. And I guess my question is, is that, was it error for the magistrate judge to conclude that under those circumstances there wasn't anything aggressive about her conduct? Isn't she, I guess I would say, isn't she within her rights to tell them repeatedly, you're not coming in without a warrant? It is certainly within her rights to say I'm not letting you in. But that doesn't mean, again, in this context of investigating this emergency with shots and a woman screaming for help that the troopers should not take into account the way she was responding. They didn't have to accept her response. At the door. She said that was me. Yeah, she says that was me, and then she, and then the trooper again is trying to find out what happened. And he says, you know, we got a report of domestic violence. She says no. Then he says, and there was shooting, and then, and following up rather on the screaming, someone shouted for help, says it was the goat. The goat was screaming for help, and I don't. It's a strange response in any circumstance. That's right. It seems to only compound the situation because she's previously told him that it was her, and now she's telling him that it was the goat. That's correct, Your Honor. And the point is what these troopers are trying to do is figure out, is there somebody who's injured inside these premises? There wasn't someone injured outside. That's true. But we had this scream for help, and we had these shots. We have a reasonable basis for believing someone might be in danger. Again, it doesn't have to be absolutely certain. Counsel, in light of the time, I want to just change focus for a second and ask about an issue that is mentioned in the magistrate judge's order and not debated extensively in the appellate briefs, and that is the officers basing their decision in part on their feeling that this was essentially a bad neighborhood or a bad part of the world, and the magistrate judge being a little worried about that and citing our case in the United States versus Montero Camargo and for the proposition that it would be dangerous for us to go down the path of permitting officers just to say that without backing it up with statistics. Do you want to address that issue? Yes, Your Honor. I don't think that was a significant factor in the trooper's decision to enter. What they were basing it on was almost exclusively the 911 call and what they knew about Sheriff. This was a man who they had previously encountered in tense situations with guns. There were questions about the bad neighborhood at the hearing. One trooper said, yes, he said, in my experience, the 911 calls tend to be accurate. It wasn't substituting for a reasonable suspicion here, and another trooper said, we have to take that into account in planning how we're going to do this. That's certainly legitimate. But it wasn't a separate factor that, in this case, served for a proxy for anything else. I have 17 seconds left for rebuttal. Thank you. Okay. I'll give you time for rebuttal. Good morning. Dan Polson on behalf of Mr. Scherff. I actually want to pick up where Your Honor just left off, and that is about the character of the neighborhood. I think that the magistrate was right to be concerned about the potential for that kind of blanket characterization to serve as a proxy for, say, race or economic characteristics of a neighborhood. The testimony at the evidentiary hearing was very generalized on that point. And I would say that the phrase, you know, high crime neighborhood is sort of, you can use that to describe pretty much any neighborhood. Every neighborhood has high crime compared to someplace else. This was a fairly rural neighborhood. This is a very rural neighborhood. That's not much of a neighborhood. Well, the magistrate in his final report, and this is a 35-page report. It's very thorough. The magistrate took four hours of testimony from the troopers. This is a rural neighborhood. The homes are spread apart. Troopers didn't enter until after Mr. Scherff had already come out of the trailer, correct? Incorrect, no, actually. And touching on the exchange that Trooper Sondergaard had with Ms. Miller, that exchange was not heard by Sergeant Fowler at the time that he's making his entrance. This was a two-pronged. He entered from the back. Excuse me? Didn't he enter from the back? He entered from the side door, correct, from what they referred to as the south entrance of the trailer. He didn't hear anything. His testimony was that he couldn't hear the exchange between Ms. Miller and Trooper Sondergaard. His entrance, and what had happened was a first individual, James Murphy, comes to the side door. Sergeant Fowler sees him. He's not armed. This individual is not in distress, doesn't look like he's in need of help. Trooper Sergeant Fowler yanks him out, puts him off to the side, detains him. Yeah, he's also not a woman who would have been screaming. Correct, but he also wasn't armed with a high-powered rifle. And actually, going back to Ms. Miller for just a moment. Right, but he has a gun, but it isn't a high-powered rifle, which means that neither at the front door nor at the back door have any officers actually seen the evidence of a high-powered rifle that's been reported. Correct, correct, right. And the scene that they encountered, I mean, I would take issue with the argument that there was any kind of disagreement by the troopers about what the situation was like when they arrived. You know, we have that comment from Trooper Sondergaard to Trooper Vick saying, sounds like a party. Trooper Sondergaard said it was quiet outside. There certainly wasn't any, you know, bullet holes in the building. There weren't any bloodstains on the property, no broken property. There's no altercation going on outside. There's no signs of any kind of argument going on. Again, raised voices is not the same thing as a verbal argument. But then, sorry, backtracking just a moment to Sergeant Fowler's entrance into the home. You know, he's pulling people out as they approach the doorstep, and then he enters Mr. Scherff's home because he, quote, sees movement. And at that point, he detains Mr. Scherff. Mr. Scherff is, again, inside his own home, is trying to retreat. Sergeant Fowler detains him, grabs him, asks him if he has any weapons. Mr. Scherff initially says he doesn't, but then admits he has a firearm in his pocket. And then at that point, Sergeant Fowler brings him outside and puts him in handcuffs. So that's a sequence of events with respect to Mr. Scherff. As far as the law goes, I don't think that there's really any dispute as to what the standard is. The magistrate's report applied the legal standard, which is anytime you have a warrantless intrusion into the home, this is the chief evil against which the Fourth Amendment is designed to protect against. And the government has a pretty heavy burden of identifying facts and circumstances that give rise to a reasonable belief that there was, in fact, At what point should the officers have stopped? I would say that they made no attempts at following up with the 911 caller. That was, I think, their first mistake. The 911 caller and How can the officers do that? By the time they, I'm sorry, by the time the troopers are in their car or on foot responding, they don't know who the 911 caller, that was dispatch, right? So how can they follow up? Well, this is a 911 call with very limited information. And the troopers acknowledged that during the evidentiary hearing, that this was a third-party report, not from somebody who's in the property, not somebody who could see what was going on. Again, the homes are pretty separated. The 911 caller, I think, acknowledged that he couldn't see. Correct. And he said, and he says at the outset, and this is what I'm getting at, the 911 caller says at the outset, I don't know if this is an emergency. I just hear some That part of the conversation was not conveyed to the troopers. Correct. And that's what I Troopers didn't hear that. The troopers didn't hear that, but they had followed up with the caller. Are they supposed to? I didn't know. Is that standard procedure for troopers to call the 911 caller? I think every case is different. But again, the content of the call in this case was so minimal and so sketchy. I don't think I've ever heard of a case in which troopers called somebody who had called dispatch. Or even just to say, dispatch, can we get more information? Anything along those lines would have been more reasonable than what they did, which is to jump to the conclusion that there's somebody inside dying. Let's say they don't make that call because they didn't make it in this case. I'm interested in Judge Bybee's question. At what point in their interactions with Ms. Miller or the other occupants of the trailer should they have turned around on their heels and walked away? I would think from the moment somebody answers the door and says there's no problem here. And certainly they're in the court. And here's the other thing is that the troopers made up their mind that they were going to go inside this trailer. That was pretty evident. The magistrate included a transcript of the exchange with Ms. Miller. It's Appendix A. And the exchange is pretty striking. Trooper Sondergaard answers the door, or Ms. Miller answers the door. Trooper Sondergaard says hello, how everything's going. She says everything's fine. Again, she doesn't have any physical signs of injury. She's not in distress. How are you doing? I'm all right. I need to come in. Those are the first times Trooper Sondergaard is saying I'm coming inside. I need to come in. Ms. Miller, you do? Yeah, there was a female that we heard screaming here. Oh, that was me. Okay, well, then I have to come in. Excuse me, why? Because do you have a warrant? And then it goes from there. Her confusion, I think, and her sort of being taken aback in the discussion about the goat, I think, was a reasonable response to a very confrontational tone that the troopers developed. It's a transcript, and I think it's susceptible to the characterization that you're giving it. But is that something that we can even properly consider? Because this gets back to the officer's subjective intent. So if there were not reasonable grounds for them to go in under emergency aid, they can't go in. But if there were reasonable grounds, even if they kind of wanted to go into the building for their own purposes, it wouldn't matter, would it? No, it wouldn't. And I think that is kind of what we have here, is we have a situation where maybe the troopers are a little bit curious, but they're rushing to a conclusion that's simply not reasonable. If they're saying this is an emergency situation, it's simply not supported by the 911 call. Both the magistrate and the district court judge said that specifically. The 911 call by itself did not provide reasonable grounds to believe that there was an emergency inside Mr. Sheriff's home. Right, but it did suggest that there might be a problem in the area. It's a rural area, which means there's not a lot of other options. It's not like we've got the wrong trailer, it's the one next door. Although I would say that there were other residences in the neighborhood that they didn't check out that was also brought out. At this corner? Yes. There were other homes that were in the area. There was a map that was admitted during the evidentiary hearing. Do you have a record site for that map? Yeah, I actually do. It was marked as Exhibit B, and it was 32-1. And that's the district court docket, so I'm assuming that's part of the record. And that kind of gives you… We don't always get the exhibit. Okay. Yeah, and that was the other issue I wanted to take up as sort of housekeeping. I assume – oh, I'm sorry, Judge Wybie. I assume that you would acknowledge that this might be a very, very different case if the 911 call had come from inside the trailer. I think that that would have been an important consideration, yes. Not to say that there must be a call from inside the house, but that's certainly one compelling fact here, and that is sort of the hallmark or one of the things that we have in the mix in all the other cases that are cited. Was the call in Snipe from inside the location the officers responded to? It was purportedly coming from inside the house. I would say that the case is sort of ambiguous about that, but they had a reasonable basis for believing that the call was coming from inside, if that makes sense. Counsel, once the officer says, good, how are you? I'm all right. You're right. He says, I need to come in. Yes, we heard that there was a female screaming here. I mean, she doesn't perceive that she would be the one in distress because she obviously doesn't look in distress, and then she says, oh, that would be me. This now confirms that they're at the right address, doesn't it? Well, and then the next thing is, yeah, we're getting ready for a Halloween party. I mean, what she's – again, the troopers are coming in with their own kind of take on things. They're talking about screaming, and I think from Ms. Miller's perspective, she's thinking this is a noise complaint. Still doesn't account for the high-powered rifle shots, and that's very, very specific. And this is the neighborhood. Going back to the character of the neighborhood for just a moment, not necessarily crime-wise, but this is a rural community where shots are heard on a regular basis. I myself live maybe four miles from where this location, from where this incident took place. The sounds of guns going off is not uncommon, and, in fact, the troopers admitted, both Sergeant Fowler and Trooper Sondergaard said, there's a gravel pit maybe a mile or two down the road, which is a site where people shoot guns. So it could have been coincidental. That is, the 911 caller might have heard a woman screaming for help and heard gunshots contemporaneous with that that might have been coming from a different location. Troopers have no way of separating those two things, or it sounds too close in time to be coincidental when the 911 caller is motivated to call 911. Right, certainly. So once they get there, the woman says, oh, that was me. It now confirms in the troopers' minds that they're at the correct location. Don't they have to see whether somebody's inside? Well, Sergeant Fowler didn't wait to find out because he was already inside the house detaining my client. So that's the problem is that the troopers are already acting while this exchange is going on. And so I would say that trying to rely on Ms. Miller's statements would be kind of bootstrapping. It would be an example of relying on something that happened after the Fourth Amendment violation. Do we know at what point in the conversation between Sundergaard and Miller that Fowler has entered into the back? Actually, I think the magistrate made findings specifically about sort of the time stamps on the audio recordings about when that entrance occurred. He said that by the time Sergeant Fowler, because Sergeant Fowler has an audio recording on his vest, by the time that he's inside the trailer, you can pick up parts of the conversation that Trooper Sundergaard and Ms. Miller are having at the front entryway. And I'm out of time, but I will stand down. Thank you. Just a few points. First of all, the Fowler entry, and that was the first one, again, to focus on what he knew at the time. Of course, he knew about the 911 call and a woman screaming for help together, and there's no reason for him to think, based on what dispatch had told him, that those weren't connected. He also knew a lot, as I said, about Mr. Scherff and that not only was he involved in tense situations with guns, but he associated with a lot of people, bad people and bad things that happened. Two people came out, and it's true that they weren't injured and they weren't armed, but it wasn't quite so innocuous because they would come at the side door, as Trooper Sergeant Fowler said, when the first man came out, he wasn't expecting to see them. He was shocked and he was surprised as if he was going to step back over the threshold. But the two who came out were male. The first was male and then a female. Then a female. Right. And that's somebody other than Ms. Miller. Excuse me?  The woman is somebody other than Ms. Miller. Yes, correct. Is it oversimplifying the government's position to say that any time somebody with Mr. Scherff's criminal record, that any time there are shots fired and a woman heard saying, stop, help, anywhere in the vicinity of his home, police can go into his house? I think those are the critical facts. I think the 9-1-1 call is specifically a woman crying for help and then knowing that this is a person who is dangerous. And cases have focused on that as part of the calculus in going to what's a reasonable belief. Certainly compelled them in their community caretaking function, not investigating Scherff for anything unlawful, that there was a risk that there was somebody dead or at least injured inside this residence. They didn't know who was there. They knew there were many people from the cars, and Fowler had an indication. Did the 9-1-1 callers just report that their woman was screaming, or did the caller report that the woman was screaming for help? He said both. I believe the transcript is, or the caller said she was saying, stop, help, stop, stop. That's correct. And we'd be happy to supply the actual 9-1-1 call. That was part of the record. So he does talk about screaming as well. But he does say those in the transcript that's part of the magistrate judge's report, talks about stop, help, stop, stop. But we do believe that under those very specific circumstances here, a reasonable police officer who doesn't know what's happening in this house, who's there, where's the high-power rifle, had an obligation to go in and make sure everything was okay, and that's what they did. Okay. Thank you. Thank you, counsel. Matter submitted.
judges: Paez, Bybee, Tigar